[Cite as *State v. Iden*, 2020-Ohio-176.]

COURT OF APPEALS
MUSKINGUM COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. Patricia A. Delaney, P.J. |
| Plaintiff-Appellee | : | Hon. Craig R. Baldwin, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| -vs- | : | |
| | : | |
| JOHN J. IDEN | : | Case No. CT2019-0004 |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:      Appeal from the Court of Common Pleas, Case. No. CR2017-0329


JUDGMENT:      Affirmed


DATE OF JUDGMENT:      January 21, 2020


APPEARANCES:

For Plaintiff-Appellee                     For Defendant-Appellant

TAYLOR P. BENNINGTON            JEFFERY M. BLOSSER
27 North Fifth Street                      765 South High Street
P.O. Box 189                            Columbus, OH 43206
Zanesville, OH 43701

*Wise, Earle, J.*

{¶ 1}   Defendant-Appellant John J. Iden appeals the January 3, 2019 judgment of conviction and sentence of the Court of Common Pleas of Muskingum County, Ohio. Plaintiff-Appellee is the state of Ohio.

FACTS AND PROCEDURAL HISTORY

{¶ 2}   On the morning of September 26, 1998, Robert Kremer drove to the Dillon State Park hunting area in Nashport Ohio to do some groundhog hunting. As he drove down a gravel access road into the park, he came upon a half-naked, blood-soaked woman standing in a field off the side of the road. Kremer stopped, grabbed a blanket he had in his truck and approached the woman.

{¶ 3}   Kremer observed the woman was bleeding profusely from a horrible injury on the top of her head. She was shaking, appeared to be in shock, and could only say "help." Kremer wrapped the blanket around the woman and attempted to call 911, but had no cell phone reception. He put the woman into his truck, drove back to the main road and tried again. Unsuccessful, Kremer drove further up the road to a home and asked the occupants to phone for help.

{¶ 4}   Muskingum County Sheriff's Office Lieutenant Franklin Pete Fisher arrived on the scene at approximately 9:30 a.m. to find the bloodied woman seated in Kremer's truck, wrapped in the blanket and otherwise wearing nothing but a t-shirt and one sock. He attempted to speak to the woman, but she was incoherent. Fisher could not even determine her name. Detective Steve Welker arrived second on the scene, and then

Natural Resource Officer Mike Reed. Welker stayed with the woman to await an ambulance while Fisher and Reed followed Kremer back to where he found the woman.

{¶ 5}   The men searched the area where the woman was found. Fisher eventually located a pile of clothing – jeans, tennis shoes and underwear. Leading up to the area where the clothing was found, he additionally found bloody drag marks on the ground and a pool of blood. Fischer called for an evidence technician to process the scene.

{¶ 6}   Meanwhile, Detective Welker accompanied the woman to Good Samaritan Hospital. Once there he could see she had a serious head injury. Her skull was visible in several places. She also had other injuries over her entire body which Welker photographed. Although she was in and out of consciousness, Welker eventually got the woman's name, J.M., a phone number for her aunt, and the fact that she had been physically and sexually assaulted by one person.

{¶ 7}   Nurse Vickie Bell completed a rape kit on J.M. that morning which was later transferred to the Bureau of Criminal Investigations (BCI) for testing. She completed the appropriate steps and collected the appropriate samples.

{¶ 8}   J.M's aunt, T.H arrived at the emergency room and spoke with law enforcement. She advised that J.M had been out with her friend Ricky Allen the evening before and that detectives should speak with him. J.M's mother wanted Allen arrested because before J.M. went into surgery, she told her mother Allen had done this. Later, however, J.M. told her aunt John Iden had done this to her. T.H. passed this information on to law enforcement.

{¶ 9}   J.M's injuries were extensive, and potentially fatal. She was seen in the emergency room by a neurosurgeon, Dr. Michael Bruce Shannon. J.M had linear

lacerations to her face, neck and extremities. These were torn-tissue lacerations as opposed to cut lacerations, some of which required sutures. J.M. additionally had bruises and linear abrasions on her arms, legs and buttocks consistent with the drag marks observed by Fischer at the scene. She also suffered a posterior depressed skull fracture. Shannon opined these injuries were inflicted, and not caused by a fall or other accident. He further opined J.M. had been held down, partially strangled, and that she had attempted to fight off her attacker.

{¶ 10} Dr. Shannon performed the surgery to repair J.M's skull. He removed debris and bone fragments and repaired a tear in the dura, the thick protective membrane encasing the brain, and from which J.M's spinal fluid was leaking. He then closed the scalp. J.M later required 2 additional surgeries. One when the bones in her skull became infected, and a second to repair the defect in her skull and add a skin graft to close the area. J.M. was left permanently scarred.

{¶ 11} J.M.'s brain injury may have been more severe had she not been hypothermic upon arrival in the emergency room. Still, the portion of J.M's brain that was injured impacted speech, understanding, and both short and long-term memory. These deficits are permanent. J.M was unable to recall the event that left her with life-threatening injuries.

{¶ 12} A few days after arriving at the hospital, J.M. was also seen by gynecologist Dr. John Lepi. Lepi's vaginal exam revealed a half-inch tear at J.M.'s posterior fourchette, the area between her vagina and rectum. The tear had begun to heal on its own. Dr. Lepi further observed on the right side of J.M's vagina, and to the right of her cervix, an area of denuded epithelium. In other words, the inside surface layer of the vagina had been

abraded. Lepi explained this was indicative of some type of forced entry which would not occur with normal intercourse.

{¶ 13} The subsequent investigation in to this matter revealed that J.M. was at her neighbor's house around 12:30 a.m. where Ricky Allen was also visiting. When Allen said he was leaving to go to a bar, J.M. asked if she could ride along. The two went to a bar called the Lighthouse and split up. Later, while Allen was dancing, J.M. approached and introduced him to a man Allen believed she had picked up – Iden. She told Allen that they were leaving and Iden would give her a ride home.

{¶ 14} Allen got home around 3:30 a.m. Later that day, he discovered Detective Stutes of the Muskingum County Sheriff's Department wanted to talk to him about J.M. Allen spoke with Stutes, and cooperated fully. He told Stutes what he knew and permitted Stutes to search his car and seize the clothing he had been wearing the evening before. Later testing of these items revealed nothing of evidentiary value. Presented with a photo array, Allen identified Iden as the man J.M. left the Lighthouse with.

{¶ 15} Detective Stutes was able to speak with J.M on September 28, 1998, even though she was in critical condition. She identified her attacker as "Mark," said she worked with him at Union Tools, and that he had given her a ride to and from work a few times. She also recalled he drove a white Ford Tempo. She told Stutes they had been to the Lighthouse, City Limits, and Beach Ridge bars. She had no recollection, however, of events from the time she left the Beach Ridge until she woke up in the hospital.

{¶ 16} Following up on this information, detectives retraced J.M.'s travels on the night in question. They spoke with Lighthouse bartender Darlena Compton, who stated J.M. is her cousin and that she saw J.M. at the Lighthouse in the early morning hours of

September 26, 1998. Compton stated J.M. arrived with Ricky Allen, but left with John Iden. Compton had not met Iden before that evening, but J.M. told her his name, that they worked together, and he was giving her a ride home. Compton also stated J.M. was drinking that night.

{¶ 17} Detectives next spoke with City Limits bartender Jennifer Harris-Winters. Harris-Winters recalled J.M. because she refused to serve her as she had no identification. J.M. was not happy about this and "created a bit of a scene" before leaving. J.M. told Harrris-Winters she and the male she was with were going to go to the Beach Ridge Lounge where she could get served. Harris-Winters was not familiar with J.M. or the man she was with.

{¶ 18} Detectives then spoke with bartender Kim Erdy who worked at the Beach Ridge Lounge the morning in question. Erdy went to high school with J.M. and confirmed she was at the Beach Ridge after midnight with a younger looking, dark-haired male. Presented with a photo array, Erdy identified Iden as the man with J.M. Erdy recalled J.M. drinking shots of tequila, and Iden having a beer. Although Erdy knew the two stayed at the bar until closing, she did not see them leave.

{¶ 19} Detectives then spoke with bartender Glenna Sanborn, who is Erdy's mother and also familiar with J.M. She too was working at the Beach Ridge the morning in question. She recalled J.M. arriving at the bar with a young-looking male. He appeared so young that Sanborn had the doormen double check his identification. Presented with a photo array, Sanborn identified Iden as the man J.M. was with. She told detectives J.M. was drinking shots of tequila. At closing, she saw J.M. and Iden leave together. Additionally, across the street from the Beach Ridge was a truck stop that many

frequented for breakfast after the bars closed. Sanborn was there at 3:00 a.m. for breakfast that morning and saw J.M. and Iden walking around the truck stop.

{¶ 20} Gregory Zigan, who knew J.M. from high school, and had previously met Iden through a friend, was also at the truck stop that morning visiting his mother-in-law who worked there. He too advised detectives that he saw J.M. and Iden walking around the truck stop and picked Iden out of a photo array. He further advised that Iden sometimes went by the name of Marcus, but his real name was John.

{¶ 21} As evidence quickly turned the investigation from Allen to Iden, detectives set out to find Iden. They arrived at his home just as he was leaving in a white Ford Tempo. He was stopped, and the vehicle seized.

{¶ 22} Detective Stutes spoke with Iden regarding his whereabouts on September 25-26, 1998. According to Iden he was at the Eagles with his mother and stepfather where he saw J.M. and another woman around 12:15 a.m. The three then went to the Beach Ridge where J.M. did shots and he had a beer. Iden stated he lost track of the other woman. He told Stutes J.M. was talking to one of the barmaids and another man who offered her a ride home. He intervened and said he was J.M.'s ride. Iden stated that shortly thereafter, he told J.M. they were leaving. He recalled it was around 1:00 or 1:15 a.m. Iden described J.M. as "bomb-shelled" and "totally out of it." He told Stutes she passed out as soon as she got into his Ford Tempo, and that he took her straight home. Iden said he knew J.M. lived with her aunt on Church Street because they worked together and he gave her a ride to and from work from time to time. He claimed he dropped her off there, needing to first shake her awake and then practically carry her to the front porch where he left her because she did not want her aunt to know she had been

out drinking. Iden claimed he was in bed by 2:30 a.m. He additionally claimed he was unfamiliar with the Dillon State Park area.

{¶ 23} Muskingum County Sheriff's Department evidence technician Timothy Hartmeyer processed the scene at Dillon State Park as well as Iden's Ford Tempo. At the crime scene, Hartmeyer had recovered several items of clothing, shoes, underwear, and a pair of urine-soaked jeans.

{¶ 24} While processing the Tempo, Hartmeyer noted that the inside of the right front door of the car looked as though it had very recently been wiped down as it was clean and the rest of the interior of the car was covered with a layer of dust. Hartmeyer took several samples from suspect stains on the passenger side of the car, inside and out. It also appeared to Hartmeyer that the passenger side front floor mat had recently been removed, as the carpet underneath where it had been was clearly indented in the shape of the missing mat. He further noted that there were balls of fiber at the crime scene which were consistent with the carpet in the Tempo's floorboards. On the passenger seat of the car was a tool box. Inside, there were tools with suspect stains, and in the bottom of the box, fresh soapy water. In the trunk of the Tempo, there was a spare tire and a jack, but no tire iron.

{¶ 25} On October 22, 1998, Detective Stutes requested further samples from Iden's car because preliminary lab reports identified areas of blood. Ultimately, a blood stain from inside the rear passenger side door was below reporting standards, but consistent with J.M. Stains from the tools yielded no reportable results.

{¶ 26} Sometime shortly after the events of September 25-26, 1998, detectives spoke with Iden's girlfriend at the time, Crystal Dunlap. Dunlap was also friends with

J.M. The first time detectives spoke with her, she offered nothing as she feared Iden. The second time, however, Dunlap stated she had become suspicious of Iden's possible involvement in J.M.'s rape and assault and asked him about the matter while she was riding in his car. Iden responded by holding a crowbar across Dunlap's body and stating "I did it to her and I can do it to you."

{¶ 27} In 1998, J.M's rape kit was processed at the BCI. The vaginal swabs and smears tested and were negative for semen. As per policy at that time, therefore, no further testing was done. In 2016, however, as part of a statewide initiative to re-test rape kits using today's advanced technology, J.M's rape kit was resubmitted for testing. Upon retesting, the perianal swab (the skin around the outside of the rectum) from the kit identified a mixture of DNA, J.M.'s, as expected, and another profile consistent with Iden. Allen was excluded from the mixture. The statistic for inclusion of Iden was 1 in 50,000.

{¶ 28} On September 20, 2017, the Muskingum County Grand Jury returned a six-count indictment charging Iden as follows:

{¶ 29} Count one, kidnapping with sexual motivation, a felony of the first degree.

{¶ 30} Count two, rape, a felony of the first degree. This count contained a sexually violent predator specification based upon Iden's two prior convictions for sexual battery.

{¶ 31} Count three, attempted murder, a felony of the first degree.

{¶ 32} Count four, felonious assault, a felony of the second degree.

{¶ 33} Count five, Kidnapping in order to terrorize of to inflict serious physical harm, a felony of the first degree.

{¶ 34} Count six, kidnapping with sexual motivation, a felony of the first degree. This count contained a sexual motivation specification and a sexually violent predator specification.

{¶ 35} Iden pled not guilty to the charges and elected to proceed to a jury trial.

{¶ 36} Before trial, on July 2, 2018, the state filed a notice of intent to introduce prior bad acts. In this motion the state outlined anticipated testimony from nine women Iden had sexually assaulted in similar, albeit in less violent fashion, in his car and in the same State Park or nearby rural area between 1994 and 1999. At trial, counsel for Iden objected to presentation of testimony from any of the women, but the trial court granted the motion over Iden's objection. The state ultimately presented testimony from five women, A.T, M.C, R.F.S, C.O, and T.K.M., all of whom testified Iden forced them to engage in sexual intercourse against their will, in his car, and in the Dillon State Park area.

{¶ 37} The state further presented evidence from Iden's ex-wife, J.W., who testified they would go to the Dillon State Park area to have sex while they were dating.

{¶ 38} J.M. testified as well, stating she recalled the evening of September 25-26, 1998, up until closing at the Beach Ridge Lounge. She does not recall leaving the Beach Ridge, nor anything that happened thereafter until she woke up in the hospital. She further had no recollection of anything she told law enforcement officials or anyone else immediately thereafter.

{¶ 39} After hearing all the evidence, the jury was provided with instructions from the trial court which included a limiting instruction as to the evidence of other crimes, wrongs, or acts. After deliberating, the jury found Iden guilty as charged. He was

subsequently sentenced to an aggregate total of 30 years to life and classified as a Tier III sex offender.

{¶ 40} Iden filed an appeal, and the matter is now before this court for consideration. He raises one assignment of error:

I

{¶ 41} "THE TRIAL COURT ERRED IN ADMITTING THE TESTIMONY OF WITNESSES WITH REGARD TO PRIOR BAD ACTS COMMITTED BY THE DENDANT."

{¶ 42} In his sole assignment of error, Iden argues the trial court erred in admitting the testimony of alleged victims A.T., M.C., R.F.S., C.O., T.K.M., and Iden's ex-wife, J.W. as their testimony was not inextricably related to the charged crimes so as to be part of the same plan, scheme, or system, was not admissible to prove a behavioral fingerprint, and was more prejudicial than probative. While we agree, we nonetheless find the error harmless.

{¶ 43} The admission or exclusion of relevant evidence rests in the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). Generally, all relevant evidence is admissible. Evid.R. 402. Abuse of discretion means more than an error of law or judgment. Rather, it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983). Absent an abuse of discretion resulting in material prejudice to the defendant, a reviewing court should be reluctant to interfere with a trial court's decision in this regard. *Sage*, 31 Ohio St.3d 173.

{¶ 44} Rule 404(B) of the Ohio Rules of Evidence and R.C. 2945.59 preclude admission of other acts evidence to prove a character trait in order to demonstrate

conduct in conformity with that trait. *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 16. There are, however, exceptions to the rule. Evidence of other crimes, wrongs, or acts of an accused tending to show the plan with which an act is done may be admissible for other purposes, such as those listed in Evid.R. 404(B); to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." In considering other acts evidence, trial courts should conduct a three-step analysis. The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. Next, the trial court is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B), proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Finally, a trial court is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. See Evid.R 403, *Williams*, at ¶¶ 19-20.

{¶ 45} "Because R.C. 2945.59 and Evid.R. 404(B) codify an exception to the common law with respect to evidence of other acts of wrongdoing, they must be construed against admissibility, and the standard for determining admissibility of such evidence is strict." *State v. Broom*, 40 Ohio St.3d 277, 281-82, 533 N.E.2d 682, (1988). As cautioned by the Ohio Supreme Court in *State v. Lowe*, 69 Ohio St.3d 527, 634 N.E.2d 616 (1994), "... we therefore must be careful…to recognize the distinction between evidence which shows that a defendant is the type of person who might commit a particular crime and

evidence which shows that a defendant is the person who committed a particular crime." *Id.* at 530, 634 N.E.2d 616. Evidence to prove the 'type' of person the defendant is to show he acted in conformity therewith is barred by Evid.R. 404(B).

{¶ 46} In this matter, the state was permitted to introduce the testimony of five women Iden raped in similar fashion to that of J.M. – in his car in the area of the Dillon State Park, and threatened with harm if or when they resisted. The state was further permitted to present testimony from Iden's ex-wife, to testify that she and Iden engaged in consensual sex in the Dillon State Park area when they were dating.

{¶ 47} In its July 2, 2018 State's Notice of Intent to Use Prior Bad Acts, the state argued this testimony was necessary to establish Iden's plan or method of operation. At trial, counsel for Iden objected to any of the women being called to testify to prior bad acts of Iden. The state responded that it should be permitted to introduce the evidence because identity was at issue, and the testimony of the women was required to identify J.M.'s attacker. T. 508-510. Here on appeal, the state argues the evidence was relevant to prove Iden's motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. The state further argues the evidence was presented to identify the individual who kidnapped and assaulted J.M. because she could not remember the attack.

{¶ 48} As an initial matter, we find the testimony of Iden's ex-wife, who stated she and Iden would drive to the Dillon State Park when they were dating to have sex was properly admitted.

{¶ 49} As to the remaining five women, all of whom testified they were raped by appellant, we find this evidence was inadmissible for any of the reasons posed by the

state. Under the *Williams* test, therefore, we find the trial court abused its discretion in admitting said evidence. First, the other acts evidence was of no significance in the determination of what took place, or what facts were likely to exist regarding J.M. Next, the testimony was not relevant to prove Iden's identity. Finally, the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

{¶ 50} That said, our inquiry does not end there. In *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, at ¶ 25, the Supreme Court of Ohio noted "the real issue when Evid.R. 404(B) evidence is improperly admitted at trial is whether a defendant has suffered any prejudice as a result. If not, the error may be disregarded as harmless error. And while courts may determine prejudice in a number of ways and use language that may differ, they focus on both the impact that the offending evidence had on the verdict and the strength of the remaining evidence. Both the error's impact on the verdict and the weight of the remaining evidence must be considered on appellate review."

{¶ 51} In *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, the Court further observed:

> Crim.R. 52(A) defines harmless error in the context of criminal cases and provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Under the harmless-error standard of review, "the *government* bears the burden of demonstrating that the error did not affect the substantial rights of the defendant." (Emphasis sic.) *State v. Perry*, 101 Ohio

St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15, citing *United States v. Olano*, 507 U.S. 725, 741, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). In most cases, in order to be viewed as "affecting substantial rights," " 'the error must have been prejudicial.'" *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 7, quoting *Olano* at 734, 113 S.Ct. 1770. Accordingly, Crim.R. 52(A) asks whether the rights affected are "substantial" and, if so, whether a defendant has suffered any prejudice as a result. *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 24–25.

Recently, in Morris, a four-to-three decision, we examined the harmless-error rule in the context of a defendant's claim that the erroneous admission of certain evidence required a new trial. In that decision, the majority dispensed with the distinction between constitutional and non-constitutional errors under Crim.R. 52(A). *Id.* at ¶ 22-24. In its place, the following analysis was established to guide appellate courts in determining whether an error has affected the substantial rights of a defendant, thereby requiring a new trial. First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. *Id.* at ¶ 25 and 27. Second, it must be determined whether the error was not harmless beyond a reasonable doubt. *Id.* at ¶ 28. Lastly, once the prejudicial evidence is excised, the remaining evidence is

weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt. Id. at ¶ 29, 33.

*Harris*, ¶ 36–37.

{¶ 52} Here, despite the fact that J.M. could not recall the attack, abundant evidence pointed to Iden.

{¶ 53} First, DNA evidence found Iden could not be excluded from the DNA found on J.M.'s perianal swab. The statistic attached to this finding was 1 in 50,000. At trial, BCI forensic scientist Andrea Dennis explained this statistic means "* * * [W]e would estimate we would need to see the profiles of 50,000 unrelated individuals before we would expect that profile to randomly occur again." Iden. While not the strongest DNA statistic, J.M. was seen with Iden that evening, not 49,999 other men, and in the 3:00 a.m. hour when according to Iden, he was home in bed.

{¶ 54} Next, five people saw J.M. with Iden on the evening in question; Compton, Allen, Sanborn, Erdy, and Zigan. T. 355, 373, 378, 382-383, 386-388, 397-398, 408-410.

{¶ 55} J.M. told Compton that she knew Iden from work, that she trusted him and that he was going to give her a ride home. T. 382-383. J.M introduced Iden to Allen before they left the Lighthouse. Although Allen did not recall Iden's name, he later identified Iden in a photo array as the man J.M. left the Lighthouse with. Sanborn saw the pair together at the Beach Ridge, and saw them leave together at closing time. T. 350-351. She too identified Iden in a photo array. T. 355. Erdy also saw the two at the Beach Ridge and picked Iden out of a photo array. T. 396-399. Both Sanborn and Zigan saw Iden walking around with J.M. at a truck stop after 3:00 a.m. T. 354, 356, 408-410. This discredited

what Iden had told detectives – that they left the Beach Ridge at around 1 or 1:15, that J.M. was "bomb shelled," had passed out in his car, and that he took her straight home from the Beach Ridge. T. 678-680, 684.

{¶ 56} Third, at the hospital, J.M. told her aunt that Iden was to blame for her injuries. T. 341, 671. J.M. later told Detective Stutes "Mark" did this to her. She further told him they worked together at Union Tools, he gave her rides to and from work, and that he drove a white Ford Tempo. T. 665-667. Zigan cleared up the issue with Iden's alias, advising detectives that he goes by Marcus, but his name is John. T. 409-410.

{¶ 57} Fourth, Iden told Dunlap that he was responsible for J.M.'s injuries, and that he could do the same to her. T. 641.

{¶ 58} Fifth, contrary to Iden's statement to law enforcement, Iden's ex-wife established he was in fact familiar with the Dillon State Park.

{¶ 59} Finally, the jury was provided with a limiting instruction as to the other acts testimony. T. ***** A jury is presumed to follow the instructions of the trial court.

{¶ 60} The above testimony was more than sufficient to identify Iden and convict him of the charged offenses. We therefore find the testimony of the five women did not influence the verdict, was harmless beyond a reasonable doubt, and when excised, the remaining evidence establishes Iden's guilt beyond a reasonable doubt. We therefore overrule Iden's sole assignment of error.

{¶ 61} The judgment of conviction and sentence of the Muskingum County Court of Common Pleas is affirmed.

By Wise, Earle, J.
Delaney, P.J. and
Baldwin, J. concur.
EEW/rw